Ranney, J.
A preliminary question has been raised, and fully argued, and although the case might perhaps be decided without requiring a solution, we have nevertheless concluded to express our opinion upon it. Upon the authority of the cases of House v. Elliot, 6 Ohio St. Rep. 497; Gest v. Kenner, 7 Ohio St. Rep. 75; Erwin v. Shaffer, 9 Ohio St. Rep. 43; and Little Miami R. R. Co. v. Allen, 12 Ohio St. Rep. 428; it is insisted by the defendant’s counsel, that the findings upon the issues of fact joined in the district court, are not open to review in this court. A careful attention to the state of legislation, upon which those cases were decided, will show their entire inapplicability to this case, and place the whole matter in a clear light. Prior .to 1845, the supreme court, proceeding upon common, law principles, uniformly refused to review on error the finding of facts in trials at law, whether found by the jury, or the court acting, by agreement of the parties, in the place of a jury. Markle v. Akron, 14 Ohio Rep. 586; Bissell v. Couchaine, 15 Ohio Rep. 63. But by the act of March 12,1845, “ to regulate the judicial courts and the practice thereof” (2 Ourwen’s Stat. 1189), appeals to the supreme court in actions at law, were abolished, and, in the 3d section, among other things, it was provided that either party should have the right to except to the opinion of the court, “ in all cases of motion for a new trial, ... by reason that the verdict may be supposed to be against law or evidence, so that such case may be removed by writ of error,” etc.; and in 1848, the same right was secured in suits in chancery, by allowing errors in law and fact to be assigned together in bills of review, and requiring the court to pass upon the questions of fact arising upon the evidence in the original cause, although appeals, in such cases, still continued to be allowed. 2 Cur-wen’s Stat. 1136; Creed v. Lancaster Bank, 10 Ohio St. Rep. 8. These acts continued in force down to the taking effect of the code of civil procedure on the 1st of July, 1853, which abolished the distinction between suits at law and in equity, and substituted for them the one form of action now in use; and in which, as a majority of this court has thought, no provision corresponding with those acts, and securing to the party the *377 right to review the judgments of inferior courts upon the facts, was to be found. Upon this state of the law, the case of House v. Elliot, and those which have followed it, were decided. But on the 12th of April, 1858 (2 S. & C. Stat. 1155), the third section of the act of 1845 was re-enacted, with no material change in its phraseology, except to adopt the judicial construction of that act, by expressly extending to a finding of facts by the court, where the jury was waived, the same right as when the farts were determined by the verdict of a jury. This last act extends to all cases whether of legal or equitable jurisdiction, or whether the facts are found by a jury or the court, and, in its application, requires the same construction as the act of 1845. A long series of decisions has very conclusively settled the principles upon which a reviewing court will proceed in such cases. It is not enough that such a court would not have made the «ame finding upon the evidence ; a mere difference of opinion between the reviewing court and the court below, as to the weight of the evidence, ought never, for the most obvious reasons, to be deemed suU ficient to reverse a judgment. Eastman v. Wight, 4 Ohio St. Rep. 159. The preponderance against the finding must be olear, obvious, and decided, to justify such interference. It is also made clear by previous adjudications, as well as by these statutes; how, and how only, the party can entitle himself to this review. Having no right to this, upon the principles of the common law, he must secure the right by conforming to the statute which gives it. To do this, he must have exhausted his remedy in the court below, where the evidence is heard; and this is never done, until that court has refused him a new trial, upon a motion, assigning for cause that the finding is not supported by sufficient evidence. Until this is done, a reviewing court is bound to' presume, that he could have had justice in the court below, if he had seen fit to ask for it. It is the decision upon this motion to which alone tho statute gives him the right to except. It is entirely immaterial whether the facts are found by a jury or the court, or whether the relief sought-m the case, is legal or equitable ; the same uniform course must be pursued, and until the party has *378 Invoked judicial action upon his motion to set aside the finding, he has laid no foundation for an exception, and has no' authority of law for bringing evidence upon the record. A motion to set aside the finding and for a new trial, a decision-of the court overruling that motion, and an exception taken to that decision, are, then, indispensable prerequisites to the-signing of a bill of exceptions for this cause; and unless they appear by the record to have been complied with, the appellate court has no power to reinvestigate the facts upon the-evidence, or to reverse the judgment, however manifest it may be that it should not have been rendered. If no such exception is taken, the party must be presumed to have been satisfied with the decision, or, at least, to have waived all objection to it.
Erom the very nature of this exception, the bill of exceptions must bring before the reviewing court all the evidence acted upon in the court below, and upon which its ruling was. founded; and as nothing but the record can be regarded, it is a matter of course, that the bill of exceptions must show upon its face, either expressly or by necessary implication, that it contains the whole. The maxim, omnia prásumuntur rite et solemniter esse acta donee probetur in conirarium, has its full and appropriate application to all the judgments of a court of competent jurisdiction, and unless the contrary is shown by the record, it will be presumed, if necessary, that other evidence was given upon the trial, which justified the court in overruling the motion. These rules and principles hhve all been, again.and again, established by decisions in this court, and it may seem a work of supererogation to repeat them here; but still the unpleasant fact remains, that several times during the present term, we have found ourselves unable to reach the questions intended by the parties to be presented for our consideration, in consequence of a want of compliance with these decisions, in taking exceptions in the court below; and we have thought that another plain'statement of the only conditions upon which we are authorized to pass upon questions of fact, might n’ot be without service.
In returning from this digression, we have yet to consider *379 whether the act of 1858, is applicable to trials in the district court. This, too, is a decided question. The case of Isham v. Fox, 7 Ohio St. Rep. 317, was commenced before the code was enacted, and tried afterward on appeal in the district court, where exception was taken to the overruling of a motion for a new trial, because the finding was not supported by sufficient evidence. It was objected in this court, upon the authority of House v. Elliot, that the facts could not be reviewed. But-the court were .of a. different opinion, and held, that the ease was governed by the third section of the act of 1845, which was continued in force as to cases pending when the code took effect, and that this section was applicable to trials, on appeal, in that court. With this decision, we are entirely satisfied; and it only remains to refer somewhat more particularly to-the legislation by which this result is effected. Neither the act of 1845, nor 1858, does, in terms, refer to trials in the-district court. The only courts named, are the common pleas and superior courts of the state; and if there was no other-legislation, an extension of their provisions to the district court would be altogether inadmissible. But by the act allowing appeals to the district courts, from the final judgments of the courts of common pleas (2 S. & C. Stat. 1157) it is provided that, “ the action so appealed shall be again tried, heard- and decided, in the district court, in the same manner as though the said district court had original jurisdiction of the action which is but another form of expression for saying, that the-action shall be tried and decided on appeal, in the same manner as in the court from which the appeal is taken. Now, one of the incidents to a trial in that court, in its regular progress- and before judgment is rendered, is the right of the party to-except to the opinion of the court in refusing a new trial because the finding is not sustained by the evidence. How could the action be said to be tried and decided in the same manner, if this right was refused? And to what end should it be allowed, except that “the case might be rfemoved by petition in error,” to the only court having jurisdiction to correct the-error, if one has been committed? In giving this construction-to these acts, we are but' carrying into effect the long settled- *380 policy of our legislature. During almost the entire period of our history as a state, it has been made possible, either by •direct appeals, or by writs of error and bills of review, and sometimes by both, to bring the facts as well as the law of every civil case originating in the courts of record, before the court of last resort for revision. In this respect we have differed widely from our sister states; but whether this policy is founded in wisdom or not, it is the plain duty of this court to ■give it effect, until a change shall be originated by the legislative department.
On recurring to the record in this case, we find that it was tried after the act of 1858 had taken effect; that the proper exception was taken, and that all the evidence is spread upon the •record; and we are, therefore, of the opinion, that the facts as well as the law of the case, are open for revision.
2. It is the object of the plaintiff’s petition to obtain a perpetual injunction upon the collection of a judgment, rendered in the court of common pleas of Seneca county, in favor of the defendant, Churchill, against the plaintiff, and the defendants William Patterson, Morgan Bricker, Erastus Rouse and •Solomon Bricker. He alleges as a fact, known to Churchill, that Patterson and Morgan Bricker were the principals in this obligation, and himself, Rouse and Solomon Bricker sureties merely for them; and this fact is admitted in the answers. The grounds for relief stated in the petition are somewhat numerous, but those having much support in the evidence may all be comprised within those averments of the petition which ■charge that certain agreements were made for extending the time of payment, without' the knowledge or consent of the plaintiff.. The scope, object, and legal effect of these agreements, constitute the points of controversy between the parties.
It is conceded that soon after the rendition of this judgment, an execution issued to the sheriff of Knox county, where all the debtors, except the plaintiff, resided, that the principals had a small amount of property which might have been seized upon the writ, and that when the sheriff was about proceeding to execute the process, upon the property of Solo *381 mon Bricker, he came to an agreement with Churchill, by which he undertook to, and did, give him security upon real estate for this, and also another judgment upon which Bricker was bound as surety for the same principals; and that Churchill, on his part, agreed to recall the execution' then in the hands of the sheriff, and order it returned, and to give to Bricker the further time of six months for the payment of one half of the judgment, and nine months for the other half thereof.
The plaintiff claims that this agreement had a much wider extent, and embraced the principals as well as the surety, Solomon Bricker; that they were active in procuring it to be made, and present when it was made, and that, while the consideration for the agreement was furnished by the surety, it was in substance and legal effect an agreement to wait upon all the parties, liable for the payment of the judgment, until the expiration of the stipulated periods. And upon this is-founded the plaintiff’s first position — that he is discharged, because, without his consent, the creditor, by a valid agreement, has given further time to the principal debtors.
But if this position is not sustained by the evidence, he nevertheless insists, secondly, that he was released by the agreement to recall the execution: 1st, because it necessarily worked an extension of time; and 2d, because it involved an injurious interference of the creditor with the execution of the writ.
And, thirdly, he insists that the admitted agreement made with Solomon Bricker, operated his discharge, in the same manner and to the same extent, as though it had been made with the principals.
To dispose of the case, we do not find it necessary to express an opinion upon any of these propositions, except the last. The first involves a pure question of fact, and as the judgment, for reasons hereafter given, will be reversed, and the evidence again submitted to the court below, it is no part of our duty to interfere with the judgment and discretion of that court, in again finding the facts. The legal positions involved in the second may, or may not, become material in the *382 further progress of the case. If they do, it will be in time then to decide them. “ Sufficient unto the day is the evil thereof.”
Before proceeding, however, to the consideration of the remaining proposition, it is necessary, both for present purposes, and as lying at the very foundation of further proceedings in the case, to dispose of a suggestion made by the. defendant’s counsel, to the effect that the long-established doctrine upon which sureties have been discharged from obligations which have been changed by agreement between the •creditor and principal debtor, has been abrogated by chapter 4, of title 15, of the code of civil procedure. This suggestion derives additional weight from the fact, that upon the question being presented in Woolworth v. Brinker, 11 Ohio St. Rep. 600, where it was left undecided, the court, after referring to a case in Tennessee, which favored the proposition, seemed to think it would deserve careful consideration, when it should more directly arise than it did in that case.
That the statute contains any words of abrogation, is not pretended; but it seems to be supposed that such may be its legal effect, upon the assumption that this chapter has furnished the surety adequate remedies, to protect himself against the injurious consequences of such arrangements. The chapter contains but three short sections. The first gives the surety a right of action, after the debt is due> to compel his principal to pay it; the second gives him a right of action to obtain indemnity, before the debt is due, .when the principal •has been guilty of such acts of fraud, as would authorize an •arrest or attachment at the suit of any other creditor ; and the third gives him the benefit of the provisional remedies, “ upon the grounds and in the manner,” that they are awarded to other creditors. In other words, where the creditor might sue; the surety may do so, and with the same effective remedies for compelling the security or satisfaction of the debt. This legislation very 'obviously and naturally takes the place ■of a former statute, repealed by the code, which allowed the ■surety, upon a written notice, to require the creditor to prose■cute the principal debtor to judgment and execution, and in *383 default of doing so, discharged the surety from the obligation. With the most obvious justice and propriety, the law has taken from the surety the right to compel the creditor to encounter the trouble and expense of prosecuting the principal debtor, for the benefit of the surety, and has armed Mm with all the rights and remedies which are given to the creditor, to enable him to accomplish the object for himself. Indeed, the statute, aside from making the remedy more complete, by adapting it to the general provisions of the code, has simply enforced the long-established remedy in equity, which entitled sureties “ to come into a court of equity, after a debt has become due, to compel the debtor to exonerate them from liability, by paying the debt.” 1 Story’s Eq. sec. 327. Step by step, with the establishment of this doctrine, has grown up that which discharges a surety when further time is given the principal debtor, and no intimation has. ever been heard, that they were, in any manner or to any extent, inconsistent with each other. In point of fact, each subserves its own separate and distinct purpose; the one enforcing the subsisting- obligation to which the surety acceded, and the other absolving him from all liability when the obligation has been materially changed, without his consent. A short reference to some of the fundamental principles, which underlie every engagement of surety-ship, will make this still more manifest, and, at the same time, sufficiently indicate the grounds upon which we resolve the remaining question in the case.
“ The contract of surety takes place when one person, to obtain some trust, confidence, or credit for another, engages to be answerable for him.” It is always accessory to the obligation of a principal, and “ it is of its essence that there should be a valid obligation of a principal debtor.” “ Without a principal there can be no accessory, and by the extinction of the liability of the former, the latter becomes extinct.” Ohio v. Blake, 2 Ohio St. Rep. 147; Theobald on Prin. and Sur. 2.
It is also matter of positive law, that the obligation of the surety can only be created in writing, and no equitable extension of its terms, by construction or otherwise, is allowed. Every contract is composed of the material terms and stipu *384 lations embraced in it, and, among these, none is more important than the time of performance. It follows, from the principles already stated, that whatever changes any of these material terms and stipulations, so as to destroy the identity of the obligation to which the surety acceded, necessarily discharges him from liability. An engagement to pay money in six months, is not the same as one to pay it in twelve months; and if the creditor, by a valid agreement with the debtor, extends the time of performance from the shorter to the longer period, he supersedes the old obligation by the new, and can not enforce payment until the longer period has elapsed. If the surety is sued upon the old agreement, to which alone his undertaking was accessory, he has only to show that that has ceased to exist, and no longer binds his principal; and if Iréis sued upon the substituted agreement, he is entitled, both at law and in equity, to make the short and conclusive answer — - non hcec in feeder a veni. But such an agreement between the-principal parties, is perfectly valid and legal; and until some method can be devised for depriving the principal of the benefits of a valid agreement, or of binding the surety to an agreement to which he never acceded (a work hitherto thought not to be within the powers of either courts or legislatures), the-discharge of the latter must ensue. I am very well aware, that this discharge has been often thought to rest upon the injurious consequences of such arrangements, either real or possible upon the rights, and interests of the surety; and, undoubtedly, in most cases, such would be their necessary tendency. But if it rested upon this ground alone, it would be very difficult, upon equitable principles, to extend the relief beyond the actual injury; while it is universally agreed that they work a total discharge, and extend to cases where no-possible injury to the surety, could have ensued. As Judge Story remarks: “ In such case, it is of no consequence, whether the surety has sustained any actual damage or not. Nay, the arrangement may be for his benefit, and yet he will in equity be discharged; for the rights of the creditor, as to his debtor, have been voluntarily suspended, and of course the relation of the surety to both, changed without his consent.” In Bowmaker *385 v. Moore, 7 Price, 223, the court of exchequer declared their inability to inquire, whether any inconvenience did actually arise to the surety, from the agreement between the principal parties, and assign as the reason, that “ if the plaintiff w«s discharged, he was discharged at the time when the agreement was entered into between themP In Samuel v. Howarth, 3 Mer. 272, the lord chancellor said: “ The creditor has no right — it is against the faith of his contract — to give time to the principal, even though manifestly for the benefit of the surety, without the consent of the surety.” And again, still more decisively, in Ross v. Barrington, 2 Ves. R. 540: “ You can not keep him [the surety] bound, and transact his affairs (for they are as much his as your own), without consulting him. You must let him judge whether he will give that indulgence, contrary to the nature of his engagement.”
But without referring to further adjudications, it is sufficient to say, that the whole current of authority fully justifies the conclusion stated by Mr. Theobald, that “the surety is dis charged if, without his consent, the principal parties make a new agreement, inconsistent with the terms of the original agreement, or if they agree to make any alteration either in the terms of the original agreement, or in the mode of per^ forming them.” Prin. and Sur. 119.
Eor a time, the English courts vaseillated upon the question, whether the continued liability of the surety might not be expressly stipulated for in the contract of extension; but such a reservation is now regarded as totally inconsistent with the contract of suretyship, and is treated as a nullity. For, as stated by the same author, “ an agreement which has the effect of disentitling the creditor to insist on the performance of the terms of the original contract, is, in effect, a discharge of the obligation created by the contract; and if the creditor discharges his principal, the surety is ipso facto discharged, in virtue of the essential principles of his contract. Theobald on Prin. and Sur 203.
But the doctrine we have been considering (originating in equity, but now largely administered by the courts of law), constitutes but an inconsiderable part of the relief afforded to *386 sureties in courts of equity. Based upon the intrinsic nature and qualities of the contract of suretyship, which imports entire good faith and mutual confidence between the parties, a system of rules has been constructed — the pure creations of equity — which have invested the surety with very important rights, and have imposed corresponding duties and obligations upon his co-sureties, the creditor and principal debtor. Among the rights thus secured to the surety, is that of paying the 'debt when it falls due, and being subrogated to all the rights and remedies of the creditor ; and of calling for immediate contribution from his co-sureties. The creditor occupies the position of a trustee for the surety, in respect to all collateral securities for the debt, and even as to legal process in the course of execution upon the debtor’s property; and Judge Story states the doctrine broadly, that if he “ does any act injurious to the surety, or inconsistent with his rights, or if he omits to do any act, when required by the surety, which his duty enjoins him to do, and the omission proves injurious to the surety; in all such cases the latter will be discharged, and he may set up such conduct as a defense to any suit ■brought against him, if not at law, at all events in equity,” 1 Story’s Eq. Jur., sec. 325. But while the discharge of the furety in all such cases, is thus positively stated, it never could have been the intention of the learned author to assert, that for every such act, or omission of duty, the surety was necessarily discharged from the whole debt. ' Such a supposition would not only contradict other portions of his own work, but would also be at variance with every adjudged case with which we are acquainted. Indeed, that a surety should be discharged from a debt of a thousand dollars, because the creditor had surrendered a collateral security for a hundred, would be utterly repugnant to every man’s sense of justice. So far from equity inflicting penalties in such cases, it may be stated as a general rule, that, where the original agreement remains intact, and only the equitable rights or remedies of the surety have been invaded, his manner of relief in a court of equity will be exactly commensurate with his actual loss. And this indicates the clear line of distinction running through *387 all the cases. Where the agreement to which the surety acceded has been changed, his obligation is annihilated and gone, and there is no power, either in courts of law or equity, to revive it against him, or to make him a party to the substituted agreement concluded between the principal parties; and in such case, his entire discharge necessarily, ensues. But where no such change has been made, and he remains bound to his original stipulations, and has been injured by the act of the creditor only in respect to the means of satisfying the debt, or- of reimbursing himself after making payment, he is entitled to have -deducted from the debt an amount equal to his injury, and no more. His rights, in this respect, are the creations of equity, administered in the courts of equity, and upon the equitable principle of malting good the loss, but never inflicting a penalty. In the first class of cases, the law preserves to the surety no remedies against his principal, for he is no longer a party to any agreement which his principal is bound to perform ; and in the other class, just so far as the creditor, by contract or otherwise, has interfered with the incidental rights or remedies of the surety, he has absolved him from all obligation to pay the debt for which he was originally bound. Such a thing as allowing the surety to violate the lawful contracts of the creditor, in working out his own remedies, is wholly unknown to the law. It accomplishes the purpose, by disabling the creditor from making any such remedies necessary for the protection of the surety.
In the light of these principles, there is very little difficulty in determining the effect of the contract of extension, made with Solomon Bricker. His obligation, like that of the plaintiff, was accessory to that of the principal debtors, whose duty it was to pay the debt. If this contract had no larger extent than is supposed in the question presented by the plaintiff’s counsel, it in no way interfered with their obligation to discharge the debt at once. That obligation remained in full force, and, in every respect, the same as when it was incurred, and the plaintiffs, as accessory to it, was wholly unchanged. But this contract with Solomon Bricker, did not simply lessen or impair, but wholly extinguished the equitable right of the *388 plaintiff to call upon him for immediate contribution. Consistently with that contract, Churchill could not receive payment of the whole judgment from the plaintiff, and allow him to extort one half of it immediately from Solomon Bricker If he intended to stand by his contract with Bricker, and wo must hold that he did, he can not escape the conclusion, that in depriving the plaintiff of his remedy, he relieved him also of the obligation to pay such proportion of the debt as Bricker would have been bound to contribute, if the plaintiff had paid the whole judgment. This preserves to the plaintiff all the possible benefits he could have derived from the employment of this remedy, if it had not been interfered with by the creditor; while, to give the contract any greater effect, would be to allow the merest technicality to override the plain justice of the case. In no possible event could the plaintiff have demanded the whole of this debt from Bricker, and when he is relieved from such part as Bricker was bound to pay, he has got everything he is entitled to ask.
Mr. Sumner, in a note to Gifford Ex parte, 6 Ves. 809, has expressed the opinion that such an arrangement between the creditor and co-surety, will discharge the surety whose remedy over is thus extinguished. He says, “it seems,” this would be so; but whether it seems to him so upon principle, or in accordance with established authority, he has not seen fit to inform us. If the former, we can only say, that we are decidedly of a different opinion; and if he draws his conclusion from the latter, it is entirely clear that the case he cites (Mayhew v. Crickett, 3 Swanston, 192), in no way supports his position. On the other hand, in the stronger case, although, as we think, governed by the same principle, where the creditor has absolutely released one of the sureties, it was expressly held in Waggener v. Dyer, 11 Leigh, 384, and Klingensmith v. Klingensmith, 31 Pa. St. R. 460, that the other surety was only released to the extent to which he might have enforced contribution. And in the very case now presented, Pothier has expressed an opinion in accordance with our conclusion.
It being admitted that Rouse, the third surety, was wholly *389 insolvent; the plaintiff was entitled to a perpetual injunction against the collection of one half the judgment. It is true, that Solomon Bricker in his answer expresses his willingness to contribute to this extent, but no readiness is expressed in the answer of Churchill, in whose favor the whole judgment stands open, to take him for it. But if it were, it would only constitute an additional reason why relief, to that extent, should have been given the plaintiff; instead of which, his petition was dismissed. Eor this error, the judgment must be reversed, and the cause remanded for further proceedings.
Peck, C.J., and Brlnkerhoee, Scott and Wilder, JJ., concurred.